3220515 Village of Elwood Appellant v. LB Andersen Land Holding, LLC and East Gate Logistics Park, Chicago, LLC, Appalachia Mr. Murphy, you may commence. Thank you. Your Honors, Jim Murphy on behalf of Appellants, the Village of Elwood. This is basically a contract interpretation case, and so we are getting into probably one of our favorite grade school topics of diagramming sentences. I know from a recent Rule 23 case that Justice Brennan and Justice Albrecht, or Justice Davenport rather, are familiar with this from Hobalt World Extension v. City of Joliet. Uniquely, actually, one of the parties to that is also a party in this case, which is East Gate. Here, the question is whether the annexation agreement involved requires the owner of the property to build a bridge over Route 53 and the Union Pacific Railroad tracks in order to join two portions of roadway. I've talked a lot in the brief about breaking down the sentences, breaking down the structure, but I think what's important is there's very specific language that would have to be written out of the language to get to where Andersen East Gate wants to get. And I call your attention to what the statement is in the sentence we're looking at. Andersen East Gate concedes that the Illinois Department of Transportation is not requiring the bridge to be built. They would have to strike out as may be required by the Illinois Department of Transportation from that sentence to say that the bridge is required. You can't get around it really any other way. It would be a little bit different, perhaps, if the end parenthesis was moved to after Illinois Department of Transportation, and so that it sort of modifies the including but not limited to, but it doesn't. It modifies all of the improvements and limits it to the roadway and intersection improvements as may be required by the Illinois Department of Transportation. The Illinois Department of Transportation is not requiring it, so the bridge is not required to be built. If the bridge isn't required to be built, the Village of Elwood is required to do nothing with regard to the Illinois Department of Transportation or with regard to Illinois Commerce Commission, which is not mentioned. Notably, of course, a bridge is not mentioned anywhere in the annexation agreement. A bridge was never contemplated by the parties. The closing of the railroad section, which sort of led to all this, was never contemplated by the parties either. Effectively, what Anderson Eatscape wants to do is rewrite this whole contract, or at least rewrite a very specific provision of it, to in order to allow them to build a bridge with the help of the Village of Elwood. That's not what's required in this contract. There are other things in sort of just knowing about the contract. It's part of an annexation agreement, which requires a public hearing. And one of the issues is, how would anybody know that a bridge was involved, contemplated in the city without it being mentioned, without it being subject to a public hearing, without there being notice of it? If this is an amendment that requires a bridge, it should go before a public hearing. The city, the members of the Village, its citizens should be able to comment on it. It should be able to comment on how that could affect the municipality, what the costs are going to be down the road to the municipality. And even one of the things we didn't touch upon, but the bridge that is being proposed by Anderson Eastgate is a bridge that does not even connect Walter Strawn to 53. It's supposed to eliminate that intersection, according to members of Eastgate. Mr. Murphy, are you conceding that the agreement is ambiguous? No, I'm not conceding that it's ambiguous. It's very clear. It's very clear that it has to be required by the Illinois Department of Transportation. That is absolutely clear, and it's not being required. But does the Illinois Department of Transportation ever require anything absent a request or a submission? I mean, are they out there looking for things to require? Hold on, let me finish my question. Or does that follow from an application? Well, it follows from the application, for example, with a road cut. If you want a road cut, they require certain things with regards to turn lanes, signage, stopping, and this is really what that's all about. A new road was being required for this, and so Illinois Department of Transportation would require certain things within 53 itself. Turning lanes, widths, additional areas. None of that comes into play with a bridge. Right. The only thing with regard to the application that would be required, and that's why there are also costs. Who bears the costs of those requirements from Illinois Department of Transportation when there's going to be a road cut? It puts it on the owner, and it's very limited in terms of what those costs are. And then once those are placed in there, those ongoing costs are those of the Illinois Department of Transportation because it's their roadway. So the ICC has closed down this intersection, so that's essentially no longer a possible mechanism to get into the property, correct? Yes, because it closed down the railroad crossing, and it just so happens the railroad crossing is very close to the intersection. So it effectively, the intersection has no value once that crossing is closed. The purpose of the annexation agreement, the reason for all of this initially was to essentially encourage development with the understanding that this access across the railway tracks was necessary for that development. Would that be fair? I think it's fair that there is an assumption, and then so what you might have in contract law is frustration of purpose by the closing down. But the remedy for frustration of purpose is not to rewrite a contract. It's other types of remedies. I apologize. Go ahead, Justice Edelman. Wasn't this intersection already, excuse me, this crossing was pre-existing? Pre-existing, yes. And it was confusing to me also in looking at this. We had a T intersection and a crossing prior to this development and prior to this agreement being reached, correct? That's correct. Thank you. And so the new intersection was an additional, sort of the additional branch of it to make it rather from a three-way intersection to a four-way intersection. In effect, the closing of the crossing turned it back to a three-way intersection, but it flipped which side one of the portions of the road was on. Thank you. That was my understanding. Can you hear me okay? Yes. I can. So at bottom line, and Justice Brennan, it looked like you might have a question. Would the bridge, as contemplated, extend a strong road across Illinois Route 53? I would say yes, it would. Not in the way that it was before, but in a different manner, yes. All right. Yes. Why shouldn't we care about that, considering that's the language in the contract? Well, but that's only a portion of the language in the contract. You have to look at the other limitations of the contract, which are what was envisioned and what was contemplated. First of all, one of the other ways, if you're talking about what is contemplated, what was contemplated was an intersection where you have traffic moving from Route 53 to Walter Strawn. What is being proposed by Eastgate is a bridge that no longer connects Walter Strawn to 53, and that it in fact eliminates the intersection. That's what the proposal is. Now that matters also in part because when you get over to that area, at least now as it's set up, that eliminates an area for emergency access also. You can't come down 53 and turn into Walter Strawn. There might be some other way of doing it, but I don't know where that is. It also affects that whole idea of an intersection, which is certainly what is contemplated under the agreement because it talks about intersection improvement. But that intersection, as we mentioned earlier, is in fact, is effectively closed down. And yet we have an annexation agreement with the purpose we've discussed previously that extends for 20 years. But you have an intersection now with the new Walter Strawn Road, not where it was, but the intersection that was actually being created by the annexation of this property is the intersection that now exists. And that's what you would also be doing away with. And again, when you talk about purpose, I think there are very few cases, I don't think I found any case that talked about in terms of purpose and intent between sort of what I'd call a macro purpose and a micro purpose. The micro purpose being what is exactly provided for in terms of the duties and obligations. I sort of, and I don't know if this is an apt analogy, but I will give it to you anyway. If I go into a jewelry store and my 30th anniversary is coming up and I say, I want to buy this piece of jewelry for the purpose of making my wife happy on our anniversary. And the jewelry store says, fine, that's what we'll sell it to you for. And I come back and I say, you know what, my wife wasn't happy with it. She wants a bigger ring for the same amount of money. You have to look at what the micro agreement is in terms of what was actually promised and not have some overlaying larger purpose that expands it upon what was actually provided in the detail of the contract. That also goes along with looking at the specific over the general in every contract, which is one of the very fundamental rules of contract construction. So ultimately, you really have to look at the language of 18B in terms of what was required to be built. And the only thing that were required to be built were things that were acquired by the Illinois Department of Transportation. The Illinois Department of Transportation is not requiring the construction of the bridge. Therefore, it's not required under 18B. You can look to the larger and I would suggest to you, and we did this in the brief also, that that other language in there in order to extend strong road across Illinois Route 53 is another limitation. For example, if Illinois Department of Transportation wanted some other requirement, maybe signage down the road that really doesn't have to do with it, but really doesn't go to the intersection. The owner wouldn't have had to and required to spend that money. I see I'm about out of time, so if you have any other questions. Justice Petal? I do not at this time. Justice Davenport? Well, Mr. Murphy, your time's not completely expired. I want to tender the microphone at this point. I will be happy to tender it to Ms. Sons. Very well, thank you. Ms. Sons? Good afternoon, Justices. May it please the Court. This is a contract case, and in terms of contract, one has to construe the contract as a whole with all of its provisions, as well as the context in which it was entered. It's absolutely clear from the planned commission meetings that everyone is aware that this property was being annexed due to its proximity to the intermodal. It was key that they could get there very quickly and straight across Walter Strawn, and there's a lot of testimony about that that I cited in my brief. Additionally, the contract has, it's a 20-year contract, so there's some flexibility obviously necessary over time. Importantly, there is a good faith provision of the contract, and it is not just a good faith provision. It says good faith, best efforts, and continued cooperation. And the whole reason for that, again, is that this is over time. I would call the Court's attention to reserve at Woodstock because it is an annexation agreement case, and as far as I know, it's the only one dealing with a good faith provision. And actually, that case did not deal with a good faith provision. It dealed with an implied good faith, and that is implied in every contract in Illinois, but we don't even need to rely on that. So we have all of that, and what reserve said was that the purpose of this is so that one party cannot take advantage of another in a way not contemplated or thwart the benefits of the contract. So we have all of that. It's 20-year. It's not a one and done, which is what Ms. Murphy seems to assert that, look, they made some intersection improvements and it's over. Addressing specifically some of the things that he spoke of, and Justice Brennan hit a little bit on what I intended to say with respect to the IDOT requirements. It doesn't say that there are requirements. It says as required. So if you have a contract to build a house and it says that it has to be required as required by building code or that the electrical has to be as required by the electrical code, no one's saying you have to build the house. No one's saying you have to have electrical. They're saying that if you have those things, this is the manner in which it has to be done. You have to comply with provisions of local authorities that state how things have to be done. So that is what that particular term is involved with. So there's the good faith. And if we're looking for an analogy, it would be more like if you had a contract for some Willis Tower, some large building that said that we're requiring you to use Otis elevators. And then Otis elevator goes out of business. They can't go, well, you know what, you're just going to have to use the stairs because we didn't contemplate Otis elevators going out of business. You have to be fluid to make it what happened. Clearly, there was contemplated that there would be elevators and Schindler elevators, even if it's a little bit different or involves different costs or whatever. You have to have elevators because it was an important part of the contract and the proximity to the intermodals was fundamental to this agreement. Can I ask a question about that? You've indicated that if I'm reading your brief correctly, you are suggesting Elwood has an obligation to file this paperwork, but then they can turn around and argue against the bridge for public safety purposes? How is that part of the same package of reasoning? I am not arguing that. They do have, and Mr. Murphy has said, look, we have an obligation to the public. And that's true, but I don't think that they can argue against it. If they want to raise safety concerns, Judge Jars has reserved that right, but there was an expert in this case. They got an expert to address some safety current concerns. And we also had an expert and they basically both agreed that the bridge is safer than an at grade crossing anyway. I don't know what safety concerns they could possibly raise. It eliminates points of contact and it's a much better solution. And if you talk to anyone involved with the ICC, everyone will tell you that a bridge is better. It eliminates potential accidents. So Judge Jars reserved their right to raise safety concerns. I don't know what those would be in this context. What they have to do is cooperate because they have jurisdiction over the street and a private party is not allowed to proceed. And that is, again, the reason for this provision in the contract in the first place is that the provision is there so that the municipality can't cross its arms and go, No, we're not. We're not going to sign your IDOT petition. You're just going to have to do without, which would completely undo some of the purpose there. So, yes, because I want to get into this a little bit. You would agree with Mr. Murphy that it was not contemplated that this the original proposal would not work, wouldn't you? I'm not sure if I understand your question. The original going straight across doesn't work because the intersection was closed. Nobody thought that the original proposal, the original idea would fail, correct? I don't think that anyone did. There have been no depositions to that effect. But, you know, at the time, I think there was probably an assumption that that would stay in place. And they effectuated that agreement. They created the crossing where they wanted to. They cooperated with IDOT. Everything was done and the problem started afterwards, correct? That is correct. In the agreement itself, and I must tell you, I haven't looked at every word in it, but I cannot find a stated purpose that is broader to use Mr. Murphy's analogy of macro purpose, where it says that we're really reaching this agreement and we're annexing this property and doing all these other things simply for the purpose of connecting these two properties. This is very specific. There's plans attached to it. Is there something I'm missing in the contract that talks about, you know, a contingency for a greater purpose? Common sense tells us that's the greater purpose. I won't argue with that. But is there anything in the contract that says that? There's nothing in the contract with respect to a broader purpose beyond the recitals themselves, which say that this is going to be, and the recitals are incorporated in, that this was intended as an extension of and part of the CIC development, the Centerpoint Intermodal. It was always supposed to be part of that. They could have joined their property association. There was already industrial built there, and this was just an extension. So instead of being two miles away now, it's basically in order to even get to that property, it's a 32-mile round trip, where it was previously a four-mile round trip, basically two miles one way. So we've added 14 miles one way to the round trip. And that is significant, again, because the purpose of locating there were transportation costs. And when they went to close it, they did have Doug Jackson, who the only thing built there currently is a Bissell facility, and he is a manager of Bissell. And he testified regarding, you know, what this is going to do to them in terms of labor, travel time, number of trucks on the road. All of those things are going to be increased very greatly for them, and certainly the remainder of the property hasn't been developed because of those transportation costs, the value of the property is significantly less. So in terms of, again, what's required, there is a case, Bright Horizons Children's Centers that we both talked about in our briefs. And Mr. Murphy has said, look, there's nothing in here about a bridge. And in that case, there was nothing about being located on the first floor, but it was child care center. And the court said, it doesn't matter that it doesn't say it has to be on the first floor. In order to effectuate the purpose of this lease, it really has to be because it's of no value to them. If you put their lease on the second floor, they can't use it. But the lease or the contract in that case specifically referenced the DCFS requirement, right? It did, and this contract specifically references that it's an extension of CIC, that it was intended to be a part of that. It was intended to be developed as part of that same. So it's a similar, is it exact? No, it's a very similar situation, though, where, again, it references that this was industrial property that was being developed for purposes of being close to the intermodal. With respect to some of the parts Mr. Murphy spoke about with grammar and construction, again, I've already talked about the IDOT. It's not a matter of what is required. It's a matter that IDOT is requiring that it be built. It's a matter of how IDOT requires it to be built. But he did reference two other cases that I think were not quoted quite correctly in terms of the grammar interpretation. He says because it's a subordinate clause that, you know, it's conditional. And that's not, an and is not the same as an or is not the same as a but is not the same as a because. It matters what the conjunction is. And here we're talking about in order to. And that is to state the purpose and the purpose is to extend Walter Strawn across. And if you look at In Remarriage of Cates, what it says is the use of the subordinate conjunction if signals that it's a subordinate conjunction. We don't have an if here. We have an in order to, which says that this was the purpose was to extend it. Additionally, in terms of and there's a second one, P-ATT&CK, same thing. It says that the relation between the clauses is determined from the particular subordinate conjunction that's used. And again, we have in order to here. So this was the whole reason for this being here. When you look at the language of that particular provision, again, it's not just talking about an intersection. And in fact, it refers to a different intersection. It is roadway improvements and intersections. So regardless of whether the connection, the intersection itself, and that goes to, again, how you define intersection where things cross, whether it's at grade or above is arguably an intersection. Certainly, when we think about roads, we think of intersections as at grades. I'll concede that. But again, this was a roadway improvement in order to connect them. And the only way that you can connect them right now is via a bridge. And so in good faith, they need to cooperate with that. And the provision itself says that they will sign anything deemed necessary. They'll execute reasonably required or deemed desirable by the owner. And obviously, these are deemed desirable by the owner because the only way that this property is valuable is if we can make that connection and get to the intermodals. There's been some talk about costs. And again, there's nothing in the record regarding maintenance costs for this bridge or how much they cost. Mr. Murphy seems to say that because the bridge is more expensive, that the maintenance is more expensive. Again, there's nothing in the record to that effect. There is significant information in the record about transportation costs when this is eliminated and they have to go around. Again, I mentioned Mr. Jackson's testimony earlier with respect to the amount of trucks that will be on the road and the additional 28 miles for round trips, which increases both labor costs, obviously gas costs, time costs. All of those costs increase. And in terms of the value of the property, the value of the property decreases. Certainly, there's public policy for safety. But again, there's nothing in the record that says that this bridge is in any way less safe. And in fact, there's information in the record that it is more safe than an add grade. So I think that although a bridge is not mentioned, the reason for the road improvements were to connect for the intermodal to extend what was there across the road. And the only way that that can be done at this point is via the bridge. Thank you. Justice Heddle or Justice Davenport, any questions? A couple. The reason this property is so valuable is because the village agreed to zone it the way it agreed to zone it and to cooperate in development. Wouldn't you agree with that? Could you repeat? You faded just a little bit. All right. We're talking about the cost and the expense and the value. But the reason that this property has value is because it was developed and that would not have happened without the village of Elwood's cooperation. You would agree with that? Correct. I mean, that's the purpose of the annexation agreement to provide zoning and all of the ancillary things. And it was zoned, but it's not currently used other than what was already built. And the other question, actually, I'm looking at the agreement closely. And unfortunately, we have whereas as opposed to numbered paragraphs here in the recitals. So I think maybe I found what you're referring to. But I want you to check for me if you would when Mr. Murphy is giving his rebuttal. It's the second whereas on page two. If that's correct, just let me know if Justice Brennan will indulge us with that answer after Mr. Murphy ends. I'm not sure if that's completely appropriate, but just confirm or refute that that is the proper paragraph of the one that you're referring to. OK, I don't actually have the agreement itself. I have a couple of pages. I don't have the recital pages, but there are a number of recitals. I have cited them in the brief that have to do with the extension across as well as a second place somewhere in the outside of the recitals with respect to the property association. Thank you. Thank you. Justice Davenport, anything? Nothing. Mr. Murphy, rebuttal. I'd like to go back to one of the things that Ms. Sun said is that the IDOT requirement is a matter of it seemed to be not a what but how. That's certainly not the way that it is stated. I think what she said is sort of like you might require, say, a taper lane, but then IDOT describes how the taper lane is supposed to be made. But it actually would be what does IDOT itself, is it requiring a taper lane to be installed? Again, what it says is owner shall at his sole expense make all roadways and intersection improvements as may be required by the Illinois Department of Transportation, IDOT. That's very clear. It's not required. It's not an obligation on the owner. And if it's not an obligation on the owner, Village of Ellwood has to do nothing. And Justice Brennan, to sort of get to your point of that interest of what's supposed to happen, the initial demand is Anderson Eastgate wanted the village to actually prosecute the case before the ICC. It's not just sort of that dichotomy of can we file it and then oppose it, which has some interesting issues, obviously. But Anderson Eastgate made the demand to actually prosecute it. Well, there's nothing about prosecuting anything before anybody within the language of this. To execute documents, yes. To do it one step more, no. So that goes to the other portion of what would the obligation be? If you assume that there is a requirement on Eastgate, and that's the other thing you'd have to say, this imposes an obligation upon the owner to build a bridge. And this is one of the things that it is convenient for them, obviously, to want to build a bridge now. And we have in the record part of the reason that it's convenient for them is because it's not just for 288 acres. It's for about 935 acres because they want to have other portions of property added on to this. Would you ever, if the shoes were on the other foot, because effectively this is what you'd have to decide, is you would impose what we think is in the record establishes a $19 million obligation on Anderson Eastgate under these provisions for what was otherwise probably an obligation under a million dollars. That's the other way to sort of take a look at it. And the answer there is they would be saying, no, we're only required to build what is required by IDOT. And IDOT's not requiring it. It just happens to be in this instance, it's in their benefit to build a bridge for the extra cost. But you have to look at the language to look at both sides, especially if you're going to write an opinion on it, because it will affect other cases. And this is where the language actually limits what is required. If it's not required by IDOT, it's not required to be built. Thank you. Any questions from Justice Hedl or Davenport? Yes, Ms. Sons, if you could answer the question about, did you figure out on the second whereas the point that Justice Hedl was looking for or not? I did not. I don't have the full agreement with me. I think the question he's asking is, is the whereas clause referred to where it says CIC as an extension of that is in there, but I don't have it in front of me. No other questions. Thank you. Mr. Murphy, who will, I'm stepping all over everybody today, who will own this bridge? I understand the Village of Elwood would actually own it. It would actually be a part of the municipal roadway. And they will have to maintain that bridge? They would. Is there anything in the record about the difference between maintaining a bridge and the cost of maintaining it? That was not fully developed. I think it goes, I think there's some common assumptions that you can make if something's up in the air. It costs more to build, it's going to be costing more to maintain. Unless there's something I don't understand about bridges maintaining their pavement for longer than roadways. Thank you. All right. The court thanks both sides for spirited arguments. We will take the matter under advisement and render an opinion in due course. Thank you very much.